406 So.2d 276 (1981)
KALMN, INC., Plaintiff & Appellee,
v.
EMPIREGAS CORPORATION, et al., Defendants & Appellants.
No. 8432.
Court of Appeal of Louisiana, Third Circuit.
November 10, 1981.
*278 Brame, Bergstedt & Brame, Joe A. Brame, Lake Charles, for defendants-appellants.
Raggio, Cappel, Chozen & Berniard, Richard A. Chozen, Lake Charles, for defendant-appellee.
Scofield, Bergstedt & Gerard, J. Michael Veron, Lake Charles, for plaintiffs-appellees.
Plauche, Smith, Hebert & Nieset, Jeffrey M. Cole, Lake Charles, for plaintiff-appellee.
Romero & Romero, Clarence E. Romero, Welsh, for plaintiff-appellee.
Before CULPEPPER, CUTRER and LABORDE, JJ.
CULPEPPER, Judge.
This case is consolidated on appeal with Southern Farm Bureau Casualty Insurance Company v. Empiregas Corporation, et al., 406 So.2d 283, and Lamotte v. Empiregas Corporation, et al., 406 So.2d 283, in which separate judgments are being rendered by us this date. All three cases are for property damage arising from the destruction of a farm house by a gas explosion and fire. The present case is by the owner of the home, Kalmn, Inc. The companion case by Mr. and Mrs. Richard A. Lamotte, occupants of the home, is for damages to the contents. The third suit is by Southern Farm Bureau Casualty Insurance Company, fire insurer of the Lamottes, for the sum of $6,150 which it paid on the loss of the contents, and for which it took a subrogation. In each of the three cases, the defendants are Empiregas, Inc. of Jennings and its liability insurer, International Insurance Company. Empiregas installed and filled the propane gas tank at the home. Defendants filed a third party demand against Anchor Gasoline Corporation, from whom Empire purchased the propane gas, which was allegedly not properly malodorized.
The three suits were consolidated for trial, but just before the trial began Southern Farm's suit was settled by a stipulation that it would receive reimbursement of $6,150 out of any judgment rendered in favor of the Lamottes. The suits by Kalmn, Inc., and by Mr. and Mrs. Lamotte were tried before a jury.
The jury found the defendant, Empiregas, was negligent. It found that damages to the contents had been sustained by the Lamottes in the amount of $41,502.21 and by Kalmn, Inc. for the home in the amount of $65,831.59. It further found that the third party defendant, Anchor Gasoline Corporation, was not liable to the third party plaintiffs for any part of those damages. From this judgment, Empiregas, Inc. of Jennings and its insurer have appealed, raising the following questions: (1) Whether the jury erred in finding Empiregas, Inc. of Jennings (hereinafter Empiregas), was *279 guilty of negligence which was the proximate cause of the explosion and fire; (2) whether the jury was in error in holding that the third party defendant, Anchor Gasoline, was not guilty of negligence which was a legal cause of the accident; (3) whether the jury abused its discretion in the amount of damages awarded to Kalmn, Inc., (4) whether the expert witness fees fixed in the judgment are excessive.
FACTS
The facts are as follows: Sometime early in the week of October 21, 1977, the Lamottes contacted Empiregas to request that the house in which they resided be furnished with gas service for the purpose of operating a furnace. The house had always been heated by gas, but the old lines had been disconnected. Mr. Lamotte wished to have the new tank situated farther away from the house. Copper tubing was specified for the purpose of making the connection between the new tank and the old existing gas line leading into the house.
Employees of Empiregas delivered a 500 gallon propane-butane tank to the Lamottes' residence on the afternoon of Thursday, October 20, 1977. On Friday afternoon, they returned, hooked up the line from the tank to the old line and filled the tank. No pressure test was conducted at this time to determine whether there were any leaks in the lines, open valves in the house, or any other means by which gas might escape. The work was performed in the absence of all occupants of the house, despite the fact that Mr. Lamotte requested that it be done during the morning hours, because no one would be at home in the afternoon. At about 10:30 P.M. October 21, 1977, Bradley Bjarko, who was residing with the Lamottes temporarily, entered the kitchen of the house and turned on the light. Minutes later, as he prepared to leave the kitchen, he turned off the light switch. The explosion and fire followed immediately, completely destroying the house, its contents, outbuildings, plants and trees.
After the explosion, it was discovered that the tank valve was in the "on" position. An expert witness from the State Fire Marshal's office testified that from his investigation he had little doubt that the occurrence was caused by sparks from the light switch igniting propane gas which had entered the house through an open value inside the house. It was shown through expert testimony, and is not disputed, that the gas in the tank did not contain the proper amount of malodorant required by the Louisiana Propane Gas Commission Rules and Regulations.
LIABILITY OF EMPIREGAS
Defendant, Empiregas, contends that it should escape liability first because it was not negligent, and, second, because, even if it was, that negligence was not a proximate cause of the incident. We will first address the negligence issue.
It is well settled that gas is an inherently dangerous instrumentality because of its highly flammable and explosive character. Those who handle and distribute it are charged with the duty to exercise that degree of care commensurate with its dangerous character and necessary to protect the public from any foreseeable injury therefrom. Raphael Bros. v. Cerophyl Laboratories, 211 La. 354, 30 So.2d 116 (La. 1947); Harris Drilling Company v. Delafield, 222 La. 416, 62 So.2d 627 (La.1952); Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (La.1963). The testimony shows that Empiregas employees, Mr. Gotreaux and Mr. Seaux, hooked up the gas line without the presence of any occupant of the household, despite the specific request by Mr. Lamotte that it be done only when someone could be present. The hookup was completed without checking for open valves inside the house and also without conducting a pressure test. No reason was given as to why they could not have waited to make the final connection until a pressure test could be performed. In the words of Mr. Gotreaux, "I don't see no reason why, more than we done it, only when we had the time to do it." There was further testimony that the valve on the tank, which was a used one supplied by Empiregas, did not have a locking mechanism. *280 All of these factors, as well as the evidence that Empiregas took no precaution to make certain the gas was properly odorized, furnish a substantial basis for the jury's finding of negligence. The jury was not clearly wrong in finding Empiregas negligent.
Empiregas also contends the jury erred in failing to recognize that there was an intervening act of negligence which was the sole proximate cause of the explosion. This contention is based on the testimony of the Empiregas employees that the valve on the tank was closed at the time they left the jobsite, but was shown to have been open after the accident. Empiregas argues some unknown person later opened the tank valve, and that this was the sole cause of the explosion.
The determination of the proximate or legal cause of a particular harm has no universal formula. Negligent conduct is a cause in fact of the harm if it is a substantial factor in bringing about that harm. For wrongful conduct to be actionable negligence, it must be found to have been a cause in fact of the resulting harm. It must be a necessary antecedent of the harm, but it need not be the sole cause contributing to the harm. The plaintiff has carried his burden of proof if he can show that he probably would not have suffered injury absent the defendant's conduct. Dixie Drive-It-Yourself Systems v. American Beverage Company, 242 La. 471, 137 So.2d 298 (La.1962); Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La. 1977); Waggenspack v. New Orleans Public Service, Inc., 297 So.2d 733 (La.App. 4th Cir. 1974). In the present case, there can be no doubt that Empire's negligent conduct was a substantial factor, a cause in fact and thus a legal cause of plaintiff's damage.
LIABILITY OF ANCHOR GASOLINE
Defendant bases its claim against the third party defendant, Anchor Gasoline Corporation, on its contention that the propane gas involved in this incident was manufactured by Anchor Gasoline Corporation, and that Anchor falsely represented to Empiregas that the gas had been odorized. Anchor's sole contention is that if the gas was not properly odorized, it did not come from Anchor.
Three sales tickets from Anchor were introduced into evidence, all showing deliveries to Empiregas in October of 1977. The ticket for October 6 showed a destination of Empiregas of Lake Charles. However, Ms. Ardoin, bookkeeper for Empiregas, testified that this shipment went to the Jennings office rather than to Lake Charles. Empire's copy of this sales ticket showed that "Lake Charles" had been scratched out and "Jennings" entered as the destination. The manifest of the transport truck which delivered the gas also had been changed to scratch out "Lake Charles" and enter "Jennings". This ticket was for 9233 net gallons of propane. The daily log book kept by Ms. Ardoin to keep track of the volume of gas in Empire's 18,000 gallon bulk tank in Jennings also reflected this delivery by an increase in the contents of the tank from 31% to 78% full.
The sales ticket dated October 13 shows 9450 gallons of propane shipped to Empiregas of Jennings. This delivery was not reflected by Empire's records, as there were no entries in the log book for a period of five days. The third ticket was dated September 19, but testimony by both an Anchor employee and by Ms. Ardoin established that the correct date was October 19. This shipment was to Empiregas at Jennings in the amount of 9087 net gallons of propane. The log book shows that these were the only gas shipments placed in Empire's 18,000 gallon tank at Jennings during the month of October of 1977. Each of these sales tickets represented that the gas shipped to Empire had been odorized by Anchor.
Anchor's plant superintendent testified that Anchor's process of odorization was manually performed, as the Anchor plant in question did not odorize all of the gas it manufactured. He further testified that the amount of malodorant listed on each ticket was adequate according to the existing regulations.
*281 The Empire employee, Mr. Gotreaux, testified positively that the gas he delivered to the Lamottes was drawn from the 18,000 gallon tank at Jennings. He worked out of the Jennings office. He was working with a man employed by the Elton office, who was at the time working out of the Jennings office because the Elton office was closed. Empire had a 30,000 gallon bulk tank at Elton, but no evidence was adduced to controvert Mr. Gotreaux's testimony that the gas in question came from Jennings rather than from the Elton tank.
Empiregas urges that the jury was clearly wrong in exonerating Anchor from any liability. Based on the foregoing evidence, we agree. The evidence shows conclusively that the gas delivered to the Lamotte residence came from Empire's 18,000 gallon tank at Jennings. Furthermore, the October sales tickets from Anchor to Empire, the log book and the testimony of Ms. Ardoin, discussed above, show conclusively that all of the gas placed in Empire's 18,000 gallon tank at Jennings during October of 1977 came from Anchor. There is no evidence of any gas in this tank coming from any other source. Thus, the gas in question did come from Anchor.
The jury found as a fact, and Anchor does not dispute, that the gas delivered to the Lamottes, contained an insufficient amount of malodorant, as proven by expert testimony of two chemists from McNeese State University. Anchor represented on its sales tickets to Empire that the gas delivered to Empire in October and placed in the 18,000 gallon tank was malodorized, but this representation was obviously false. Empire was entitled to rely upon Anchor's obligation to deliver the thing sold, i.e., malodorized gas. LSA-C.C. Art. 2475. Since the gas was found to be inadequately odorized, Anchor is guilty of a breach of its obligation to Empire. The failure to adequately odorize the gas was found by the jury to be a cause of the explosion and fire. Thus, Anchor is liable to Empire on the third party demand.
DAMAGES
The function of an appellate court in reviewing a damage award is not to decide what it considers an appropriate award on the basis of the evidence, but rather only to review the exercise of the trier of fact's discretion. Reck v. Stevens, 373 So.2d 498 (La.1979); LSA-C.C. Article 1934(3). A reviewing court might disagree with the amount of the award fixed by a jury, but it should not substitute its opinion for that of the trier of fact. Appellate review of awards for damages is limited to determining whether the trial court abused its much discretion.
Three tests have been utilized in determining property damage: (1) Cost of restoration, if the damaged item can be adequately repaired; (2) difference in value prior to and subsequent to the damage, and (3) cost of replacement, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined or the cost of repairs are more than the value. However, no mechanical rule can be applied with exactitude in the assessment of property damage under LSA-C.C.P. Art. 2315. Each case must rest on its own facts and circumstances as supported by the proof in the record. Coleman v. Victor, 326 So.2d 344 (La.1976); Cobb v. Insured Lloyds, et al., 387 So.2d 13 (La.App. 3rd Cir. 1980).
Very obviously, under the circumstances of this case, cost of repairs is inapplicable as a measure of damages, since the house was totally destroyed. Likewise, the second test cannot be used, since there is no evidence as to the value of the house prior to the damage. Therefore, the plaintiffs should be awarded the costs of replacing the home new, less reasonable depreciation. Hymel v. Tom Alexander Brokerage Company, 348 So.2d 104 (La.App. 4th Cir. 1977), writ denied, 350 So.2d 894 (La.1977).
When property is damaged through the legal fault of another, the primary objective is to place the plaintiff in the position that he would have occupied if the injury complained of had not been inflicted on him. Coleman v. Victor, supra.
*282 Defendant urges that the jury fell into error in making an award which was not supported by the evidence. Plaintiffs' expert estimated the replacement costs of the house in December of 1980 at $67,628. The estimated replacement cost of the outbuildings was $8,744, plus "a couple thousand dollars more", because part of the salvageable material was destroyed subsequent to the estimate. Total damage to the grounds, trees and shrubbery was estimated at $6,817.49. There was further testimony by plaintiffs' expert that there would be a higher cost for replacing the oak floors and wood paneling in the house, which had not been figured into the estimate of the replacement costs because such materials would be very difficult to procure and, if they could be procured, the cost of such would be prohibitive. Therefore, the basic estimated replacement cost of $67,628 would actually not place the plaintiff, Kalmn, Inc., in the same position as before the damage.
Defendant contends the jury failed to take into account the 20% lower replacement cost in 1977 (at the time of the loss), than in 1980 (at the time of trial), and the depreciation of 25 to 30% testified to by its expert, an insurance adjuster.
After careful consideration of all evidence, even taking into account the lower replacement cost of 1977 and reasonable depreciation, we can find no abuse of discretion in the jury's award of $65,831.59.
EXPERT WITNESS FEES
The defendant contends that the expert witness fees assessed against it should be set aside because the trial court failed to follow the proper procedure set forth in LSA-C.C.P. Articles 1920 and 3666. Defendant relies upon Rains v. Diamond M Company, 396 So.2d 306 (La.App. 3rd Cir. 1981). This case involved the fees of two expert medical witnesses claimed to have been grossly excessive. The facts relative to the time employed by the witnesses, which formed the basis of the justification for the fees charged, did not appear of record. For that reason, this court set aside the fixing of the expert witness fees by the trial court.
We find Rains inapposite to the present situation. The fixing of expert witness fees lies within the sound discretion of the trial court to be fixed with reference to the value of time and the degree of learning or skill required. Hebert v. Diamond M Company, 385 So.2d 410 (La.App. 1st Cir. 1980); Veuleman v. Sims, 382 So.2d 245 (La.App.1980). They will not be disturbed unless there has been an abuse of that discretion. Wm. T. Burton Industries, Inc. v. Busby, 348 So.2d 1328 (La.App. 3rd Cir. 1977); Williams v. Harvey, 328 So.2d 901 (La.App. 4th Cir. 1976).
From our reading of the record, we find that the time employed and the degree of learning and skill of each witness in this case is reflected by his individual testimony. The fees, which were fixed in amounts ranging from $200 to $450, are not so excessive as to constitute an abuse of discretion by the trial court.
For the reasons assigned, the judgment appealed is reversed and set aside insofar as it relieves the third party defendant of liability. Judgment is now rendered on the third party demand in favor of third party plaintiffs and against third party defendant, Anchor Gasoline Corporation, in the amount of one-half the damages awarded the plaintiff by the trial court in the principal action. In all other respects, the judgment is affirmed. Costs of both the trial and appellate courts are assessed equally against defendant-appellants and third party defendant-appellee.
AFFIRMED IN PART, REVERSED IN PART.